UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

SISAWAT SINGMUONGTHONG,       )
                              )
            Plaintiff,        )
                              )
v.                            )        Case No. 4:18-cv-04196-SLD-JEH
                              )
EDWIN R. BOWEN and JOHN BALDWIN,   )
                              )
            Defendants.       )

ORDER

Before the Court is Defendants Edwin R. Bowen and John Baldwin's Motion for

Summary Judgment, ECF No. 41.  For the reasons stated below, the motion is GRANTED.

**BACKGROUND**

I.     **Undisputed Material Facts**[1]

A.     **Background**

Plaintiff Sisawat Singmuongthong is an Asian male who is tan-colored and of Laotian

national origin.  From 1998 through 2013, he was a correctional officer at Sheridan Correctional

Center ("Sheridan"), an Illinois Department of Corrections ("IDOC") facility.  As a correctional

officer, he was charged with keeping the facility safe and secure, a duty he continued to carry out

after he became a lieutenant at Sheridan in 2013.

In December 2016, Plaintiff was promoted to assistant warden of operations at Kewanee

Life Skills Reentry Center ("Kewanee"), a soon-to-be-opened IDOC facility.  Kewanee is a

---

[1] On a motion for summary judgment, a court must construe the record in the light most favorable to the non-moving
party.  *See Scheidler v. Indiana*, 914 F.3d 535, 540 (7th Cir. 2019).  Unless otherwise noted, the undisputed material
facts of this case are drawn from Defendants' statement of undisputed material facts, Mem. Supp. Mot. Summ. J. 2–
21, ECF No. 42; Plaintiff Sisawat Singmuongthong's response to Defendants' statement of undisputed facts, Resp.
2–25, ECF No. 44, and statement of additional material facts, *id.* at 25–33; Defendants' reply to Plaintiff's statement
of additional material facts, Reply 1–27, ECF No. 49, and the exhibits to the filings.

rehabilitation-focused facility.  It aims to rehabilitate inmates who have previously served in a correctional center by teaching them life skills to help them succeed when they reenter society. As assistant warden of operations at Kewanee, Plaintiff was responsible for the facility's security and reported directly to Kewanee's warden, who, during most of Plaintiff's tenure there, was Anthony Williams.

Plaintiff was hired after expressing interest in the position to the following people: Williams, Michael Atchison[2] (then IDOC's chief of operations), and Sandra Funk (then deputy director of IDOC's central region).  Williams and Funk interviewed him, agreed he was an acceptable candidate, and then recommended him to Atchison and Bowen, who was then IDOC's chief of staff.  Bowen then met with Plaintiff and gave him the position.

### B.    Plaintiff's Compensation

The salaries of newly-promoted IDOC wardens and assistant wardens were generally set according to a formula.  A newly-promoted warden or assistant warden's salary would be five percent greater than his previous salary; as Bowen testified, "we figure out what five percent of their salary was and we would increase their salary by that much."  Bowen Dep. 18:5–7, Mem. Supp. Mot. Summ. J. Ex. C, ECF No. 42-3.  The qualifications of the warden or assistant warden would not be considered; the key factor would be his prior salary.  For this reason, it is possible for a pay discrepancy to exist between two individuals in the same role.

Plaintiff's salary was determined by the formula.  As a lieutenant at Sheridan, he earned $6,191.00 monthly ($74,292.00 yearly).  When he became the assistant warden of operations at Kewanee, his salary was raised by five percent (and rounded to the nearest dollar) to $6,501.00

---

[2] Plaintiff spells this name Atchinson, *see* Resp. 26, but Defendants spell it Atchison, *see* Reply 8.  The Court follows Defendants' spelling.

monthly ($78,012.00 yearly).  Plaintiff complained about his salary on multiple occasions to at least Williams.[3]

But not everyone's salary was determined by the formula.  Sometimes, newly promoted wardens and assistant wardens would get a raise of greater or less than five percent.  For example, Jennifer Parrack, who served as assistant warden of programs at Kewanee during much of Plaintiff's tenure there, was given a greater than five percent raise.  She got her position after serving as an IDOC contractor where she was making approximately $66,000.00; before that, she was a State of Illinois employee, working for the Illinois Prisoner Review Board (the "Board").  She was given the salary she had while working at the Board, which was approximately $85,200.00.  Another IDOC assistant warden, Darwin Williams ("Darwin"), received a greater than five percent raise too.  He had been making approximately $36,000.00 or $37,000.00 a year and was given a raise to $50,000.00 a year when he became assistant warden "because of the level of responsibility and the facility he was working at."  *Id*. at 75:23–76:2.

C.      **Plaintiff's Non-Promotion**

On or around January 16, 2018, Williams was terminated after an investigation substantiated allegations that he engaged in "[i]nappropriate conduct of a sexual nature with subordinate staff."  *See id.* at 40:17–18; Pl. Dep. 96:4–6, Mem. Supp. Mot. Summ. J. Ex. A, ECF No. 42-1.  Plaintiff was interviewed multiple times as part of the investigation.  While IDOC searched for a new warden at Kewanee, Plaintiff was put in charge of running the day-to-day operations there.  This primarily meant he was charged with "sign[ing] off on certain paperwork at the facility."  Funk Dep. 39:15–18, Mem. Supp. Mot. Summ. J. Ex. D, ECF No. 42-4.  He was interested in becoming the new warden.

---

[3] The parties dispute whether he also complained to Bowen.  *See* Resp. 8.

But he was never considered for the job, as the Williams investigation "also indicated or suggested that [Plaintiff] had difficulty making good administrative decisions." Bowen Dep. 47:13–16. Specifically, the investigation indicated "he spent too much time at bars with subordinate staff" and "failed to report inappropriate conduct of a sexual nature." *Id.* at 48:1–5. Bowen told Plaintiff he did not get the job because of his relationship with Williams.

The job instead went to Charles Johnson, who at the time was the assistant superintendent at Peoria Adult Transition Center ("Peoria"), another IDOC facility. Johnson was recommended by Funk, who had known and worked with Johnson for years. Funk reached out to him because he "had worked at several facilities," "knew the security process inside and out," and "was familiar with . . . offenders going out into the community and working" by virtue of his experience at Peoria. Funk Dep. 42:23–43:6. Johnson was hired as warden on March 1, 2018.

### D. Plaintiff's Investigation and Termination

Soon after Johnson became the warden, another investigation commenced—this one concerning Plaintiff. On March 8, 2018, an anonymous letter was sent to Baldwin—then acting director of IDOC—alleging that Plaintiff (among other things) verbally abused and sexually harassed an IDOC correctional officer trainee. Specifically, the letter alleged he made inappropriate advances and comments to the trainee at the 2017 IDOC Christmas party. Baldwin received the letter on March 13, 2018; that day, the trainee and her husband were interviewed. The trainee stated that while she and Plaintiff were at the party, he blocked "her path of travel and looked her up and down a couple of times." Report of Investigation 2, Bowen Aff. Grp. Ex. A, ECF No. 49-1 at 4–9. She stated that a few days later, while she, Plaintiff, and IDOC correctional lieutenant Tyrone Baker were in Kewanee's reception/administration pod, Plaintiff apologized for his actions and said, "Ya, because you were fucking hot, I was not going to let

you go through." *Id.* (quotation marks omitted).  Her husband indicated she relayed her allegations to him.

On March 15, 2018, Baker was interviewed.  He corroborated the trainee's allegations, noting Plaintiff told him "he should have seen [the trainee] because she was really hot." *See id.* at 3.  Baker added that he believed Plaintiff's comments made the trainee feel uncomfortable and noted she was "shaking her head like she wanted [Plaintiff] to stop making the comments." *Id.* at 4.  When Plaintiff was interviewed later that day, he denied the allegations. *Id.* at 4–5.

The investigator determined the allegations against Plaintiff were substantiated. Specifically, the investigator concluded Plaintiff "ma[de] inappropriate comments" to the trainee "that were sexual in nature while on duty and at their place of employment" and was "untruthful during the course of his interview." *Id.* at 5.  Mark Delia, IDOC's chief of investigations, told Bowen the allegations against Plaintiff were substantiated.  Bowen relayed the results to Baldwin, who made the decision to fire Plaintiff.  On March 16, 2018, Bowen delivered Plaintiff a letter signed by Baldwin informing him of his termination without explanation. *See* Termination Letter, Mem. Supp. Mot. Summ. J. Ex. K, ECF No. 42-11 ("As a Senior Public Administrator for the Illinois Department of Corrections, you are exempt from the Personnel Code and you serve at the pleasure of the Director.  Effective at the close of business on Friday, March 16th, 2018, you are being terminated from the Illinois Department of Corrections.").

## II.    Procedural History

Plaintiff filed suit against IDOC on September 25, 2018.  Compl., ECF No. 1.  After IDOC moved to dismiss the complaint, Mot. Dismiss, ECF No. 5, Plaintiff filed an amended complaint adding Bowen and Baldwin as Defendants in their individual capacities, Am. Compl.

ECF No. 8.  IDOC, Bowen, and Baldwin moved to dismiss this complaint too.  Second Mot. Dismiss, ECF No. 13.

Plaintiff then moved for, and was granted, leave to file another amended complaint.  *See* Mot. Leave File Am. Compl., ECF No. 15; Mar. 28, 2019 Text Order.  In his Second Amended Complaint, the operative complaint, he asserts that Bowen and Baldwin discriminated against him and retaliated against him in violation of 42 U.S.C. § 1981, bringing his claims against them via 42 U.S.C. § 1983.  Second Am. Compl. ¶¶ 34–43, ECF No. 16 (discrimination); *id.* ¶¶ 54–62 (retaliation).  He also asserted discrimination and retaliation claims against IDOC under the Illinois Human Rights Act, 775 ILCS 5/1-101–5/10-104.  Second Am. Compl. ¶¶ 44–53 (discrimination); *id.* ¶¶ 63–71 (retaliation).  IDOC moved to dismiss the claims against it, arguing they were barred by the Eleventh Amendment and state sovereign immunity, IDOC Mot. Dismiss ¶ 2, ECF No. 18, and Plaintiff agreed to dismissal of the claims "based on the arguments presented in" IDOC's motion, Resp. IDOC's Mot. Dismiss 1, ECF No. 23.  Accordingly, the Court dismissed the claims against IDOC.  July 25, 2019 Text Order.  Thus, the only remaining claims are that Baldwin and Bowen discriminated against Plaintiff on the basis of his race, color, and/or national origin by paying him a lower salary than non-Asian, tan, and/or Laotian employees, not hiring or interviewing him for the warden position, and terminating him, *see, e.g.*, Second Am. Compl. ¶ 39; and that Baldwin and Bowen retaliated against him by terminating him for complaining of pay discrimination and complaining that the decision not to hire him for the warden position was discriminatory, *see, e.g.*, *id.* ¶ 57.[4]  Defendants move for summary judgment on all of Plaintiff's remaining claims.  Mot. Summ. J 1.

---

[4] The Second Amended Complaint makes a brief reference to age discrimination, *see* Second Am. Compl. ¶ 32, but does not explicitly assert an age discrimination claim, and Plaintiff does not mention age discrimination in his summary judgment briefing.  To the extent he was intending to assert an age discrimination claim, the Court

## DISCUSSION

### I.      Legal Standard

Summary judgment is warranted when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A material fact is one that might affect the outcome of the suit, and a factual

dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of showing the absence of genuine disputes of material

fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant shows an absence of

evidence to support the nonmoving party's case, the burden shifts to the nonmovant, which must

then "set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S.

at 256.  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position

will be insufficient; there must be evidence on which the jury could reasonably find for the

[nonmovant]."  *Id.* at 252.  Indeed, the nonmoving party cannot rest on the pleadings and must

do more than simply show there is "some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  It must instead

"cit[e] to particular parts of materials in the record, including depositions, documents, [and] . . .

affidavits or declarations" or show "that the materials cited do not establish the absence or

presence of a genuine dispute."  *See* Fed R. Civ. P. 56(c)(1).

In deciding a motion for summary judgment, a court must view the evidence in the light

most favorable to the nonmoving party, not weigh the evidence or assess its credibility, and draw

all justifiable inferences in favor of the nonmoving party.  *Reeves v. Sanderson Plumbing Prods.,*

---

considers it abandoned.  *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597–98 (7th Cir. 2003) (deeming the plaintiff's
negligence claim abandoned because he failed to delineate it in his district court brief opposing summary judgment).

*Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255.  However, it is not a court's task to scour motion papers in search of a genuine issue of material fact; as the Seventh Circuit has long stated, "[j]udges are not like pigs, hunting for truffles buried in the record."  *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 898 (7th Cir. 2018) (alteration in original) (quotation marks omitted).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  When the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  *Matsushita*, 475 U.S. at 587.

## II.  Analysis

### A.  Threshold Issues

#### i.  Sovereign Immunity

Defendants argue they are entitled to summary judgment on both claims against them because the damages Plaintiff requests—lost wages and benefits—would be paid by the State of Illinois and therefore the suit is barred by sovereign immunity.  Mem. Supp. Mot. Summ. J. 22–26, ECF No. 42.

"[T]he Eleventh Amendment immunizes unconsenting states from suit in federal court." *Murphy v. Smith*, 844 F.3d 653, 656 (7th Cir. 2016) (quotation marks omitted).  While Eleventh Amendment immunity does not generally extend to employees sued in their individual capacities, *Hafer v. Melo*, 502 U.S. 21, 30–31 (1991), "the court is obliged to consider whether [a suit against a state employee in his personal capacity] may really and substantially be against the state," *Luder v. Endicott*, 253 F.3d 1020, 1023 (7th Cir. 2001).  "[A] suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration . . . ."  *Pennhurst State Sch. & Hosp. v. Halderman*, 465

U.S. 89, 101 n.11 (1984) (quotation marks omitted).  Both parties appear to agree that a claim for

lost wages is really and substantially against the state.  *See* Mem. Supp. Mot. Summ. J. 23–24

(citing, for example, *Omosegbon v. Wells*, 335 F.3d 668, 671–73 (7th Cir. 2003)); Resp. 36–37,

ECF No. 44 (arguing that "Defendants incorrectly focus only on Plaintiff's claims for money

damages for lost pay").

Plaintiff argues that his suit should proceed, however, because he also seeks punitive

damages.[5]  *See* Resp. 34–35; *Reinebold v. Ind. Univ. at S. Bend*, Case No. 3:18-CV-525 JD,

2019 WL 1897288, at *3 (N.D. Ind. Apr. 25, 2019) ("Courts have allowed individual capacity

claims to proceed where a plaintiff seeks both punitive and compensatory damages, because

punitive damages may be available from the Defendants sued in their individual capacity *but not

from the state*, which is immune to suit except for injunctive relief . . . ." (quotation marks and

alteration omitted)); *see also Smith v. Wade*, 461 U.S. 30, 35–36 (1983) (noting that punitive

damages are available in § 1983 suits).  Defendants do not satisfactorily respond to this

argument.  They acknowledge it, Reply 28, ECF No. 49, and cite to a district court case for the

proposition that "neither a claim for punitive damages nor the allegation that the defendant state

official is being sued in his individual capacity is dispositive" of whether the Eleventh

Amendment bars an individual capacity claim, *id.* (quoting *Bornick v. Sondalle*, 179 F. Supp. 2d

941, 949 (E.D. Wis. 2001)).  However, they then proceed to explain why the State of Illinois

would be required to pay lost wages and benefits without addressing the punitive damages

request again.  *See id*. at 29–30.  In light of the punitive damages request, the Court finds that

Plaintiff's suit may proceed.

---

[5] The parties do not mention this, but Plaintiff also alleges he suffered emotional distress, *see* Second Am. Compl.
¶¶ 43, 62, for which he could receive compensatory damages that would be paid by Defendants, *see Tanner v. Bd. of
Trs. of Univ. of Ill.*, No. 3:17-CV-3039, 2018 WL 1161140, at *9 (C.D. Ill. Mar. 5, 2018).

### ii.  Section 1981 Protection

Defendants also argue that Plaintiff is not entitled to protection under § 1981 because he served in a policymaking position.  *See* Mem. Supp. Mot. Summ. J. 26–28.  Essentially, their argument is that because Title VII exempts employees serving in policymaking positions from its definition of employee, *see* 42 U.S.C. § 2000e(f), § 1981 does as well because the analysis of § 1981 claims is identical to Title VII claims.  *See* Reply 30–31; Mem. Supp. Mot. Summ. J. 26. Plaintiff argues that Defendants cite no authority for applying Title VII's statutory definition of employee to § 1981 claims.  Resp. 37–38.

Defendants' argument is frivolous.  Title VII is an extensive statutory scheme with employment discrimination protections for individuals, enforcement mechanisms for those protections, and remedies for violations of those protections.  Section 1981 provides a right to "[a]ll persons within the jurisdiction of the United States . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."  42 U.S.C. § 1981(a). While the Seventh Circuit has said that, in the employment context, "[t]he legal analysis for discrimination claims under Title VII and § 1981 is identical," *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 788 (7th Cir. 2019), this is a generalization recognizing that the question under both statutes is whether an adverse action was taken against an employee or applicant for employment on the basis of a protected characteristic and that the evidence relevant to claims under both statutes is the same, *see id.* at 788–89.[6]

---

[6] Indeed, tracing the history of this proposition leads to a more nuanced statement of the law: "The substantive standards and methods of proof that apply to claims of racial discrimination and retaliation under Title VII also apply to claims under § 1981."  *Smith v. Bray*, 681 F.3d 888, 896 (7th Cir. 2012), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016).  *Smith* even acknowledges in a footnote that there are

The statutes are certainly not the same in all respects.  *See Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 460 (1975) ("Section 1981 is not coextensive in its coverage with Title VII.").  While a plaintiff can obtain relief under Title VII if he can show that a prohibited factor was a "motivating factor" in an adverse action, under § 1981 a plaintiff must establish but-for causation.  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1017–19 (2020).  Claims under § 1981 are not subject to Title VII's exhaustion requirements.  *See, e.g.*, *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007).  And, most analogous to the issue before the Court, § 1981 does not encompass Title VII's exemption of employers with fewer than fifteen employees, *see* 42 U.S.C. § 2000e(b).  *Johnson*, 421 U.S. at 460 (noting as one of the differences between § 1981 and Title VII that Title VII "is made inapplicable to certain employers"); *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*, 160 F.3d 1048, 1049 (5th Cir. 1998) ("Because Title VII applies only to employers with 15 or more employees, § 1981 provides the only refuge under federal law from race-based employment discrimination by those who hire fewer than 15 employees." (footnote omitted)).

The exemption of employees in a policymaking position from Title VII is a statutory exemption.  It does not apply to claims under § 1981.  *See Adams v. McDougal*, 695 F.2d 104, 107–09 (5th Cir. 1983) (holding that a deputy sheriff could bring an employment discrimination claim under § 1981 regardless of whether he was an appointee); *Ramirez v. San Mateo Cnty. Dist. Attorney's Off.*, 639 F.2d 509, 513–14 (9th Cir. 1981) (holding that the plaintiff was exempted from Title VII because he was a member of an official's personal staff but that the plaintiff's § 1981 and § 1983 claims were properly tried before the jury); *Stubblefield v. City of*

---

differences between the statutes.  *See id.* at 896 n.2 ("One key difference between § 1981 and Title VII is that the latter authorizes suit only against the employer as an entity rather than against individual people who are agents of the employer.  Under § 1981, individuals may be liable.").

*Jackson*, 871 F. Supp. 903, 910 (S.D. Miss. 1994) ("This court . . . declines to read such an exemption into § 1981 or § 1983.").

### B.  Merits of the Claims

#### i.  Discrimination

"Section 1981 guarantees equal rights to all citizens regardless of race and in the context of employment provides that all people have the 'same right . . . to make and enforce contracts.'" *Morris v. BNSF Ry. Co.*, 969 F.3d 753, 758 (7th Cir. 2020) (alteration in original) (quoting 42 U.S.C § 1981(a)).  To prevail on a § 1981 claim, a plaintiff "must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast*, 140 S. Ct. at 1019.

The key question on a motion for summary judgment in a § 1981 employment discrimination case is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the . . . adverse employment action." *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  In answering this question, a court is required to evaluate the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself," *id.*, and may consider direct and circumstantial evidence without differentiation, *see Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) ("Whether a plaintiff offers direct or circumstantial evidence of discrimination, this court made clear in *Ortiz* . . . that all evidence belongs in a single pile and must be evaluated as a whole." (quotation marks omitted)).[7]  Examples of circumstantial evidence that may "support an

---

[7] While *Igasaki* concerns claims under Title VII (and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–34, and the Americans with Disabilities Act, 42 U.S.C. §§ 12101–213), *see Igasaki*, 988 F.3d at 955, courts "generally apply the same standards to Title VII and [§] 1981 race discrimination claims at the summary judgment stage," *Smiley v. Columbia Coll. Chi.*, 714 F.3d 998, 1002 (7th Cir. 2013).  *See also supra* Section II(A)(ii).  Although the causation required to prove Title VII and § 1981 claims differs, *Comcast*, 140 S. Ct. at 1017–19, the Seventh Circuit has found that other discrimination statutes with but-for causation requirements, for

inference of intentional discrimination [include] ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020).

"One way of proving employment discrimination . . . remains the burden-shifting framework" set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation marks omitted). Under this framework, a plaintiff must show evidence of the following: "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) (quotation marks omitted). If a plaintiff satisfies each of these elements, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (quotation marks omitted).

But while "[a] plaintiff may put forth and a court may analyze evidence using the *McDonnell Douglas* framework, . . . neither must do so," *id.*, as it "is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's [protetected characteristic]," *see Johnson*, 892 F.3d at 894. "[R]egardless of whether [a] court also analyzes the evidence pursuant to *McDonnell Douglas*," it must, at the summary judgment stage, "consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff

---

example the ADEA, are subject to "similar analytical approaches—*McDonell* [sic] *Douglas* and *Ortiz*—at summary judgment" as Title VII. *Igasaki*, 988 F.3d at 960. Therefore, the Court finds it appropriate to cite to Title VII cases.

suffered an adverse action because of" his protected characteristic.  *See Tyburski*, 964 F.3d at

598 (quotation marks and emphasis omitted).

Plaintiff alleges Defendants discriminated against him by (a) paying him less than "non-

Asian, tan, and/or Laotian employees in his same position," (b) not promoting him to the warden

position at Kewanee, and (c) terminating him.  *See* Second Am. Compl. ¶ 39; *see also* Resp. 40,

44, 48.  Both Plaintiff and Defendants cite and apply the *McDonnell Douglas* framework.  *See*

Mem. Supp. Mot. Summ. J. 28–29; Resp. 39.  The Court will therefore analyze each claim first

under the *McDonnell Douglas* framework, and then with a view of the evidence as a whole.

### a.   Disparate Pay[8]

#### 1.  *McDonnell Douglas*

The prima facie case for a disparate pay claim "boils down to a showing of equal work

for unequal pay, with the protected class as the distinguishing factor."  *Poullard v. McDonald*,

829 F.3d 844, 854 (7th Cir. 2016).  "Because the prima facie and pretext inquiry often overlap, if

a defendant offers a nondiscriminatory reason for its actions, [a court] can proceed directly to the

pretext inquiry."  *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020).  Here,

Defendants offer a nondiscriminatory reason for Plaintiff's salary: his "raise when promoted to

Assistant Warden of Operations was the standard raise generally applied throughout IDOC."

Reply 32.  Thus, the Court proceeds to consider whether Plaintiff has evidence that this reason

was pretext for discrimination.

To satisfy the pretext element, a plaintiff  "must identify such weaknesses,

implausibilities, inconsistencies, or contradictions in the defendant's proffered reasons that a

---

[8] Defendants argue that Plaintiff lacks any evidence to show that Baldwin had personal involvement in setting
Plaintiff's salary.  Mem. Supp. Mot. Summ. J. 30–31.  The Court finds it unnecessary to address this given its ruling
on Defendants' other arguments.  *See infra* Section II(B)(i)(a)(1).

reasonable person could find them unworthy of credence and hence infer that the defendant did

not act for the asserted non-discriminatory reasons." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457,

465 (7th Cir. 2014) (quotation marks omitted). Indeed, pretext means "a lie—a phony reason

meant to cover up a disallowed reason." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005).

"In determining whether an employer's stated reason . . . is pretextual, the question is not

whether the employer's stated reason was inaccurate or unfair, but whether the employer

honestly believed the reason it has offered . . . ." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495,

505 (7th Cir. 2017) (quotation marks omitted).

Plaintiff suggests he can establish that Defendants gave a pretextual reason for his salary

because they deviated from IDOC's standard raise for "other Non-Asian, Non-tan and/or Non-

Laotian" wardens and assistant wardens, relying on the salary increases given to Parrack and

Darwin. *See* Resp. 41–44.[9] His arguments are not particularly well-developed. He first argues

that Defendants' deviation from standard practice in setting Parrack's salary is evidence of

pretext.[10] *Id.* at 41–42. True, many cases stand for the proposition that "[a]n employer's unusual

deviation from standard procedures can serve as circumstantial evidence of discrimination" or

pretext. *See, e.g.*, *Baines v. Walgreen Co.*, 863 F.3d 656, 664 (7th Cir. 2017) (citing cases for the

proposition that such deviations can establish pretext). But in these cases, the deviation is

---

[9] Plaintiff also points to Daniel Sullivan, who received a ten percent raise when he was promoted to warden, Resp. 44, but the Court has no evidence of Sullivan's race, color, or national origin, so it can draw no inference from his treatment. Plaintiff further relies on John Burle, who was appointed acting assistant warden of operations at Kewanee after Plaintiff's termination. *See id.* Because Burle, who is white, was allowed to take the position in an acting capacity, he kept his position in his union and received a supplemental pay increase. *See* Reply 17–18. The Court has no evidence of what Burle's pay was, so he is not a useful comparator. Moreover, Burle was allowed to take the position in an acting capacity because no one wanted the position. *See* Bowen Dep. 54:21–55:1. Plaintiff, on the other hand, was interested in and accepted the position on a non-acting basis, aware that it would take him out the union. *See, e.g.*, Pl. Dep. 27:22–28:1, 53:6–13.

[10] While Plaintiff ostensibly relies on the alleged deviation from standard practice as circumstantial evidence of discrimination, *see* Resp. 41–42, it is so intertwined with his pretext argument that the Court considers it as a pretext argument.

generally in how the employer treats the plaintiff, not a comparator.  *See id.* at 659 ("[The plaintiff] offered evidence that the manager who handled her earlier EEOC charges intervened in the 2014 decision not to rehire her, and that she did so in ways that deviated significantly from Walgreens' standard hiring procedures.  Walgreens offers no explanation for this unusual behavior."); *Joll*, 953 F.3d at 930 ("After the interview, her references were contacted sooner than was ordinary (with important consequences for her), while Arredondo's were contacted later, as was usual, and Kerezman's not at all—suggesting a higher baseline of scrutiny for Joll.").  But here Plaintiff is arguing that Defendants deviated from the standard practice for others; he cites no cases for the proposition that evidence that an employer deviated from its rules for someone else is evidence of pretext for discriminating against a plaintiff.

A similar proposition that Plaintiff appears to rely on is that "selective enforcement of company policy can establish" that reliance on the policy was pretextual.  *See* Resp. 41–42 (citing *Coleman v. Donahoe*, 667 F.3d 835, 857 (7th Cir. 2012) ("[E]vidence of selective enforcement of a rule calls into question the veracity of the employer's explanation." (quotation marks omitted))).  But in cases that find selective enforcement constitutes evidence of pretext, the plaintiff is again usually singled out by being held to a rule that most others that are potentially subject to the rule are not.  *See Coleman*, 667 F.3d at 859 ("Coleman has offered evidence sufficient to support a finding that Arient and Pelletier were situated similarly to her, are outside her protected classes, and received more lenient punishment for a comparably serious violation of the same rule."); *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 892 (7th Cir. 2001) ("[T]he weakness of the proffered justification for the termination is further emphasized by the fact that the only other time that United has categorized an action as an unauthorized deviation, the involved employee, a white female, was not terminated."); *Williams v. City of Valdosta*, 689

16

F.2d 964, 975 (11th Cir. 1982) ("It is undisputed, however, that the City's adherence to its formal promotional policy was inconsistent and arbitrary at best.  This inconsistency supports the conclusion that resort to the examination requirement was a pretext for singling out Williams for unfavorable treatment.").

Plaintiff is perhaps arguing that the standard raise was only offered to him, but he has failed to provide evidence from which a factfinder could so find.  He has pointed to only a few examples of people given greater than five percent raises.  There are over a hundred wardens and assistant wardens within IDOC.  Bowen Dep. 86:9–10.  Bowen testified that "in most cases, a five percent increase was given," *see id.* at 89:11–12; indeed, Plaintiff does not dispute that this was the standard raise, *see* Resp. 26.  Plaintiff's two examples of exceptions made to this rule do not suggest that the standard raise was only offered to him to single him out.

Or perhaps Plaintiff is merely making a comparator argument.  "A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, nondiscriminatory reason for the adverse job action was a pretext for racial discrimination."  *Gordon*, 246 F.3d at 892 (quotation marks omitted).  "The similarly-situated inquiry is a flexible one."  *Poullard*, 829 F.3d at 855.  "[T]he proposed comparator must be similar enough to permit a reasonable juror to infer, in light of all the circumstances, that an impermissible animus motivated the employer's decision."  *Coleman*, 667 F.3d at 841.

Parrack and Darwin are not appropriate comparators.  Bowen testified that in some circumstances, IDOC gave newly hired or promoted wardens or assistant wardens more than a five percent raise.  *E.g.,* Bowen Dep. 18:8–10.  He explained that one reason they granted increases of more than five percent was "[i]f the employee . . . was coming from a position

outside the agency." *Id.* at 18:13–14.  Parrack was cited as an example: she was working as a

contractor before taking the assistant warden of programs position.  *See id.* at 18:19–23.[11]  And

Bowen testified that Darwin's pay was raised to $50,000.00 from approximately $36,000.00 or

$37,000.00 "because of the level of responsibility and the facility he was working at."  *Id.* at

76:1–2.  Bowen testified that the lowest salary they could pay someone in a warden or assistant

warden position was $45,000.00, *id.* at 19:23–20:4, and that Plaintiff was "on the low end of the

middle" of the pay range when he was promoted, *id.* at 76:12–15.  Plaintiff neither came from

outside the agency nor was making less than the lowest an assistant warden could be paid—and

did not work at Stateville Correctional Center ("Stateville"), where Darwin worked, *id.* at 75:7–

10—so Parrack and Darwin are not similarly situated comparators for drawing an inference

regarding why Plaintiff did not receive a greater-than-five-percent raise.[12]

In any case, it is undisputed that Plaintiff was the only Asian assistant warden or warden

at IDOC during the period relevant to this suit.  *See* Reply 8.  Though Plaintiff has shown that

two non-Asian, non-tan, and non-Laotian employees were treated more favorably, there were

undisputedly approximately one hundred other wardens and assistant wardens who were also

non-Asian (and therefore non-Laotian).  The Court fails to see how the fact that two people were

given bigger raises suggests that the decision to apply the standard raise to Plaintiff, along with

---

[11] While there is uncertainty over who made the decision to match Parrack's prior State of Illinois salary, *compare* Bowen Dep. 37:8–16 (testifying that Baldwin asked if IDOC could match Parrack's State of Illinois salary, so Bowen made that recommendation to the Governor's office), *with* Baldwin Dep. 32:18–19, Mem. Supp. Mot. Summ. J. Ex. B, ECF No. 42-2 (testifying that he did not know how Parrack's salary was determined), Plaintiff has not provided evidence to dispute the reason Bowen offered for this decision: that she was hired when she was a consultant, not an IDOC employee.

[12] Defendants argue that Parrack is not an appropriate comparator because of her job duties and qualifications. Reply 32.  But there is no evidence job duties and qualifications were taken into consideration—in fact, both parties agree that qualifications were not considered in setting salary.  *See id.* at 3.  Variables that were not considered by the employer are irrelevant to the similarly situated inquiry.  *Eaton v. Ind. Dep't of Corrs.*, 657 F.3d 551, 559 (7th Cir. 2011) ("A characteristic that distinguishes two employees, regardless of its significance when objectively considered, does not render the employees non-comparable if the employer never considered that characteristic.").

many others who were admittedly not Asian, was pretext for discrimination.  *Cf. Han v. Whole Foods Mkt. Grp., Inc.*, 44 F. Supp. 3d 769, 794–95 (N.D. Ill. 2014) (holding that the plaintiff could not show that the reason offered for her termination—that she violated a policy against eating food from the store before paying for it—was pretextual on the basis that "not all Whole Foods employees who violate[d] the eating policy [we]re fired" because it was "undisputed that Whole Foods had [the] policy" and Whole Foods had shown that there were employees outside of the plaintiff's age-group and race who were fired for violating the policy).

Plaintiff has not met his burden to show that a reasonable factfinder could find the reason offered for giving him a five percent raise was pretextual; thus, he cannot survive summary judgment under the *McDonnell Douglas* framework.

### 2.  *Evidence as a Whole*

Looking at all the evidence in the record, the Court finds that no reasonable jury could find that Plaintiff was paid less than other employees due to his race, color, or national origin. Plaintiff's arguments were all addressed with respect to the *McDonnell Douglas* framework: that Defendants deviated from their standard practice and that Defendants treated non-tan, non-Asian, and non-Laotian employees differently.  The Court finds no evidence in the record that could support an inference of discrimination.  Defendants are entitled to summary judgment on this claim.

### b.      Failure to Promote

### 1.  *McDonnell Douglas*

To establish a prima facie case in the failure-to-promote context, a plaintiff must produce evidence showing "(1) she was a member of a protected class; (2) she was qualified for the position sought; (3) she was rejected for the position; and (4) the employer promoted someone

outside of the protected class who was not better qualified for the position." *Riley v. Elkhart Cmty. Schs.*, 829 F.3d 886, 892 (7th Cir. 2016).

Here, Plaintiff argues that Defendants discriminated against him by failing to promote him to warden after Williams was terminated. *See* Resp. 44. Defendants have offered a nondiscriminatory reason for not promoting Plaintiff: the investigation into Williams "also indicated or suggested Plaintiff had difficulty making good administrative decisions, meaning [he] spent too much time at bars with subordinate staff and failed to report inappropriate conduct of a sexual nature." Mem. Supp. Mot. Summ. J. 38. Thus, the Court proceeds to discuss whether Plaintiff can establish that this reason is pretext for discrimination.

Plaintiff argues that "Defendants['] stated reason for not promoting Plaintiff to the warden position is false," pointing to a few pieces of evidence. Resp. 48. First, he argues that Baldwin, the ultimate decisionmaker, "did not know if Plaintiff was considered for the position of warden." *Id.* Second, he argues the allegations did not come to Bowen's attention until days before he was terminated, so at the time the warden position was filled he "was not under investigation." *Id.*[13]

Neither argument is convincing. Baldwin did testify that he did not know whether Plaintiff was considered for the position, but the Court fails to see how that shows that the reason relied on was pretext for discrimination. Baldwin testified that his involvement in filling the warden position was that he talked to Johnson "after the hiring process had recommended"

---

[13] Plaintiff also discusses his and Johnson's qualifications but only in the context of whether he could set forth a prima facie case. *See* Resp. 44–47 (identifying the elements of a prima facie case to include a showing that "the employer promoted someone outside the protected class who was not more qualified for the position" and then arguing that "Johnson was not more qualified than Plaintiff for the position of warden"). While a plaintiff bringing a failure to promote claim can establish pretext based on his qualifications, to do so he must show his qualifications "are so favorable . . . that there can be *no dispute* among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." S*ee Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 381 (7th Cir. 2020) (quotation marks omitted). Plaintiff does not attempt to make this showing.

Johnson to him and that he did know whether anyone else was considered for the position.
Baldwin Dep. 42:18–19, 43:18–20, Mem. Supp. Mot. Summ. J. Ex. B, ECF No. 42-2.  Earlier,
he testified that his responsibility in hiring was merely to approve who other people had selected.
*Id.* at 19:15–23.  That Baldwin did not know whether anyone other than Johnson was considered
does not suggest a pretextual reason was given for not selecting Plaintiff; Baldwin was not
involved in identifying candidates.

Plaintiff's timing argument is unpersuasive because it conflates two sets of allegations.
Williams was terminated on January 16, 2018.  The investigation that led to Williams's
termination indicated that Plaintiff made poor administrative decisions.  The sexual harassment
allegations against Plaintiff were not made known to Defendants until March 13, 2018, when
Baldwin received the anonymous letter.  Bowen's testimony that the allegations against Plaintiff
only came to his attention "days before he was terminated" refers to the sexual harassment
allegations, not the allegations against Plaintiff that came to light during the investigation into
Williams.  *See* Bowen Dep. 50:15–52:23 (making this comment in the context of questioning
about the sexual harassment allegations made in the anonymous letter).

Plaintiff has not met his burden to show that a reasonable factfinder could find the reason
offered for the failure to promote him to warden was pretextual; thus, he cannot survive
summary judgment under the *McDonnell Douglas* framework.

### 2.  *Evidence as a Whole*

The only other argument Plaintiff makes is that Defendants "deviated from the common
practice" of hiring the assistant warden of operations to replace the warden and that this
deviation from standard procedures is "circumstantial evidence of discrimination."  Resp. 47.[14]

---

[14] The Court addresses this argument outside of the *McDonnell Douglas* framework with respect to the promotion
claim because Plaintiff makes a clear separate pretext argument, unlike with respect to the pay claim.

But Plaintiff has not established that this was so common a practice that the failure to hire the assistant warden of operations suggests discrimination. All he has pointed to are five examples of IDOC hiring the assistant warden to replace wardens. *See id.*[15] There are more than twenty-five IDOC facilities. *See* Bowen Dep. 16:18–19; Baldwin Dep. 28:16–19. A jury could not find a standard practice or procedure from five examples. Moreover, Bowen, who was involved in hiring assistant wardens and wardens throughout IDOC during his tenure as chief of staff, *see* Bowen Dep. 17:4–13, testified that "[t]he assistant warden . . . could voice their interest in [an open warden] position, but that [did not] mean he w[ould] be considered or she w[ould] be considered," *id.* at 45:14–18.

Plaintiff has not demonstrated that "the evidence would permit a reasonable factfinder to conclude that" he was not promoted because of his race, color, or national origin. *See Ortiz*, 834 F.3d at 765. Defendants are entitled to summary judgment on this claim as well.

### c.   Termination

Plaintiff argues he was terminated due to his race, color, and national origin. Resp. 48. This discriminatory termination claim is best viewed as a discriminatory discipline claim, as Plaintiff primarily asserts Defendants applied their legitimate expectations in a disparate manner. *Id.* at 49–50. Indeed, he spends the bulk of his argument explaining how other IDOC workers were not terminated for committing acts purportedly like those of which he was accused. *See generally id.* at 48–50.

---

[15] He cites to one of Defendants' undisputed material facts for the proposition that "[i]t is common practice at IDOC to have the Assistant Warden of Operations at a facility be next in line for Warden at the institution." Resp. 47 (citing Defendants' undisputed fact number 106). But Defendants' listed fact is merely that Plaintiff testified that there was such a practice, *see* Mem. Supp. Mot. Summ. J. 15–16, not that there was such a practice.

22

### 1. *McDonnell Douglas*

Usually, a plaintiff alleging he was terminated on account of his race can show a prima face case by proving (1) he is a member of a protected class, (2) he was meeting his employer's expectations, (3) he was terminated, and (4) a similarly situated co-worker who is not a member of a protected class was not terminated. *See Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 730 (7th Cir. 2011). But in cases of allegedly discriminatory discipline, the second element merges into the fourth. *Id.* However, because Defendants have offered a nondiscriminatory reason for Plaintiff's termination—that an investigation substantiated allegations that he sexually harassed a subordinate employee, Mem. Supp. Mot. Summ. J. 39—the Court proceeds to the pretext analysis.

First, Plaintiff argues that he can show pretext because Defendants did not terminate similarly situated white employees for similar misconduct. *See* Resp. 50 ("Comparator evidence is directly relevant to a pretextual inquiry."); *id.* at 51 ("[T]he difference in punishment levied against Plaintiff and Parrack, Lemke and Marshall further call into question the veracity of Defendant's [sic] explanation.").

"[W]hen uneven discipline is the basis for a claim of discrimination, the most[ ]relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor, rather than job description and duties." *Coleman*, 667 F.3d at 849 (first alteration in original) (quotation marks omitted). The key question is whether the comparators "have engaged in conduct of comparable seriousness"; [c]onduct may be comparably serious if it violates the same rule or is of a similar nature." *de Lima Silva v. Dep't of Corrs.*, 917 F.3d 546, 559 (7th Cir. 2019) (quotation marks omitted).

Plaintiff puts forth several purported comparators. None of them are sufficiently similarly situated. First, he claims Parrack "violated the standards of conduct, which is what [he] was accused of doing, and she only received written discipline." Resp. 49. Her conduct consisted of misusing a radio and discussing an investigation with another person. *See* Parrack Dep. 17:14–20, Mem. Supp. Mot. Sum. J. Ex. E, ECF No. 42-5. These infractions are not nearly as serious as sexually harassing a coworker.

His second proposed comparator, though, did commit conduct of comparable seriousness. Michael Lemke, Plaintiff claims, was accused of sexual harassment and merely got demoted from warden to assistant warden of programs and transferred from Sheridan to East Moline Correctional Center ("East Moline"). *See* Resp. 49; Pl. Dep. 141:23–142:8. But Plaintiff did not show he had any personal knowledge of Lemke's situation when testifying about it in his deposition, and the Court therefore cannot consider his testimony. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Moreover, Bowen explained Lemke was never the warden at Sheridan and was never moved to East Moline because of sexual harassment allegations. Bowen Aff. ¶ 6, Reply Ex. Q, ECF No. 49-1.[16] While he was demoted from warden to assistant warden of operations and transferred (from Stateville to Sheridan), his demotion had nothing to do with sexual harassment. *Id.* ¶ 7. When he *was* accused of sexual harassment, Bowen placed him on administrative leave, and Baldwin fired him after the allegations against him were substantiated. *Id.* ¶ 8.

Plaintiff next cites Curtis Marshall, noting that when Marshall was IDOC's acting assistant chief of investigations, he "had reports from his time as a police officer of inappropriate

---

[16] There can be no doubt that Bowen does have personal knowledge of Lemke's situation. *See* Bowen Aff. 1 ("I have direct and personal knowledge of the facts stated herein . . . .").

behavior, specifically, it was alleged that he stopped a woman who was in labor for speeding and claimed that . . . [he] needed to see how dilated she was." *See* Resp. 49 (quotation marks omitted). But he cannot be a comparator because, as Plaintiff notes, he was a policer officer when he committed this act, not an IDOC employee under Baldwin's or Bowen's supervision. *See id.*; *see also* Bowen Dep. 69:1–18 (testifying that IDOC did not investigate this allegation because the behavior occurred when Marshall was not an IDOC employee).

Invoking the experience of Marvin Reed, who was an assistant warden at Stateville, does not help Plaintiff either. Plaintiff asserts Reed "had allegations brought in a formal complaint against him by a young lady and he was moved to [another facility]." Resp. 32. However, Plaintiff did not provide any details concerning these allegations, so there is no way of comparing what Reed was accused of to what Plaintiff was accused of. In any event, Plaintiff never argues Bowen or Baldwin had anything to do with Reed's purported transfer.

Lastly, Plaintiff claims Randy Pfister as a comparator, asserting Pfister was arrested for domestic abuse and only got transferred. *See id.* But Plaintiff again testified without establishing any personal knowledge. Indeed, "all [he] kn[e]w" about Pfister's transfer was what was reported "in the paper." Pl. Dep. 141:12–15. Bowen, meanwhile, testified Pfister "was not moved . . . as the result of any alleged arrest for domestic abuse." Bowen Aff. ¶ 9. Even assuming reading a newspaper article can establish personal knowledge, Plaintiff does not claim Pfister committed any offense while on the job. Plaintiff has not pointed to any comparators who committed similar misconduct, so he cannot establish pretext in this manner.

Plaintiff next argues "the legitimacy of the reason given by Defendants" is called into question because Baldwin does not recall reviewing the results of the investigation into Plaintiff

25

before firing him.  Resp. 50.  But there is no evidence Baldwin made his decision blindly; he testified that he was briefed on the results by Bowen.  *See* Baldwin Dep. 45:22–46:5.

Finally, Plaintiff attacks the investigation itself, arguing "the 'results' of the investigation . . . [are] suspicious" because he was fired the day after he was interviewed.  Resp. 50.  He reasons "[w]hen you compare the fact . . . [he] was only interviewed once on the day prior to his termination to the fact that the investigation into . . . Williams required multiple interviews . . . [,] the inference is that the allegations were not as serious as the ones that warranted Williams['s] termination."  *Id.*  The Court does not have sufficient information regarding Williams's alleged misconduct—such as whether it was limited to two discrete incidents like Plaintiff's alleged sexual harassment or involved more diffuse allegations—to make a useful comparison.  In any case, even if the investigation were a sham, Plaintiff has produced nothing to demonstrate Bowen or Baldwin thought it was.

Plaintiff cannot establish that a reasonable factfinder could find that the reason offered for his termination—that an investigation substantiated sexual harassment allegations against him—was pretext for discrimination.  Therefore, he cannot survive summary judgment under the *McDonnell Douglas* framework.

### 2. *Evidence as a Whole*

The record does not contain any evidence that Plaintiff's termination had anything to do with his race, color, or national origin.  His arguments to the contrary fail.  *See supra* Section II(B)(i)(c)(1).  Defendants are entitled to summary judgment on this claim.

### ii.  Retaliation

In his retaliation claim, which is also brought under § 1981, Plaintiff alleges Defendants fired him for "complain[ing] of discrimination in his pay" and "complain[ing] of discrimination

regarding not being selected for the [w]arden position."  Second Am. Compl. ¶¶ 56–57.  Section

1981 "encompasses retaliation claims when an employer takes an adverse employment action

against an employee for asserting rights protected by § 1981."  *Smith v. Rosebud Farm, Inc.*, 898

F.3d 747, 752 (7th Cir. 2018).  "To establish a *prima facie* case of retaliation, a plaintiff must

demonstrate: (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse

employment action; and (3) that there is a causal link between the two."  *Oliver v. Joint Logistics

Managers, Inc.*, 893 F.3d 408, 413 (7th Cir. 2018).  Relevant here, "[a]n employee engages in a

protected activity by . . . opposing an unlawful employment practice."  *See Northington v. H &

M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013).[17]  But not every workplace complaint is statutorily

protected—a complaint must allege discrimination based on a characteristic protected by § 1981,

*see Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) ("While a report of

discrimination to a supervisor may be statutorily protected activity under Title VII, the report

must include a complaint of national origin discrimination or sufficient facts to raise that

inference."), and "[v]ague and obscure complaints do not constitute protected activity,"

*Northington*, 712 F.3d at 1065 (quotation marks omitted).

    Plaintiff's retaliation claim fails, as the record reveals he never engaged in a protected

activity.  Indeed, there is no evidence he ever complained to either Bowen or Baldwin that he

was discriminated against on a characteristic protected by § 1981.  He even admitted as much,

testifying he "didn't complain about" "being discriminated against based on race, color, national

origin or age."  Pl. Dep. 110:8–13.  While he claims he engaged in protected activity by

complaining about his salary on three occasions in 2017 and by complaining that he was not

---

[17] Although the retaliation claim at issue in *Northington* was brought under Title VII, *Northington*, 712 F.3d at 1065,
"the analysis for . . . [retaliation] claims [under Title VII and § 1981] is the same," *Pantoja v. Am. NTN Bearing
Mfg. Corp.*, 495 F.3d 840, 848 (7th Cir. 2007), and the Court accordingly cites this case without reservation.

promoted to warden, Resp. 51, there is no evidence these complaints concerned his Asian race,

tan color, or Laotian national origin.  *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 885 (7th

Cir. 2012) ("Keeton never complained to her employer that any actions taken against her by co-

workers or by anyone at Morningstar were related to race and nothing about the incidents

themselves gave any hint that race was at issue.  Thus, Keeton cannot show that she engaged in

protected activity.").

Because Plaintiff did not complain of race, color, or national origin discrimination,

summary judgment is warranted on his retaliation claim as well.

## CONCLUSION

Accordingly, Defendants Edwin R. Bowen and John Baldwin's motion for summary

judgment, ECF No. 41, is GRANTED.  The Clerk is directed to terminate Defendants'

Memorandum of Law in Support of Defendants' Motion for Summary Judgment, ECF No. 42, as

pending on the docket because it was erroneously filed as a motion, then enter judgment and

close the case.

Entered this 30th day of September, 2021.


s/ Sara Darrow
_____
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE